[No. 1524.]

## Harrison Williams v. The State.

1. Murder—Malice—Evidence.—See the opinion for evidence admitted upon a trial for murder, which was objected to upon the ground that it tended to disclose another and a prior offense than that for which the accused was on trial, but which is held competent as tending to establish malice.

2. Same—Case Stated.—Before and at the time of the homicide, the defendant was shown to have worn clothes very much soiled. Over objections, the State was permitted to prove that the defendant, knowing that he was being sought by the officers, went to a neighbor's house on the next night, broke open a trunk, and took therefrom a pair of pants, drawers and shirt. *Held*, that under the circumstances of this case this evidence was properly admitted. See the opinion *in extenso* on the question.

3. SAME—FACT CASE.—See evidence held sufficient to support a verdict for
   murder in the first degree with the death penalty.

APPEAL from the District Court of Navarro.     Tried below be ·
fore the Hon. L. D. Bradley.

The offense charged against the appellant was the murder of
Ada Sallard, in Navarro county, Texas, on Monday, June 25,
1883. The conviction was for murder in the first degree, and
the death penalty was awarded.

The first witness for the State was Emmeline Jordan, a com-
plete resumé of whose testimony is given in the opinion, except
that, as shown by the record, when the deceased left the place
of the battery, going towards town, and saying that she was go-
ing to report him for the battery upon his wife and the witness,
the defendant followed her with a stick in his hands, saying that
he would kill the deceased if she did report him.

Lewis Sallard testified, for the State, that about six o'clock on
Monday, the day of the homicide, he went to work in Barnard's
oat field, at a point some distance from the field fence which
ran along the Corsicana and old fair grounds road, and in sight
of the road. About ten o'clock he saw Mr. Doolen, the consta-
ble. leave the road going towards the fair grounds, and just as
he passed out of hearing over the bridge, the defendant came
to the witness through the corn field. He drew from his pocket
an old red pocket handkerchief—the same subsequently found
around the neck of the deceased, and now exhibited in court—
and wiped the sweat from his face. He also drew a small der-
ringer and a razor from his pants pocket, and remarked that he
was "tired of being reported by d—d niggers, and was going
to stand no more of it; that the next one who reported him was
a dead nigger; that Ada had gone to town to report him, and
that he would kill her for it." He had a large elm stick in his
hand, and talked like he was mad. The witness became some-
what frightened, and remarked to him that it was imprudent
to talk that way, and asked him if he was not tired of working
for the county. He replied: "Yes, by G—d, I am, and I am go-
ing to do no more of it." He then said that he had beaten two
niggers that morning. Witness then told him if that was all he
had done, the officers would not follow him, if he would leave
the county. He replied that he was not going to leave, but was

going to "kill a nigger before sundown." He then left, taking the lane towards the narrow gauge railway.

Some time after the defendant left, and about twelve o'clock, the witness started to dinner, and in the road met Mr. Doolen on his return to town. He told Mr. Doolen the way the defendant had gone, and then went on to his house. Between one and two o'clock, the witness went back to work. Between three and four o'clock, he saw the bare head of a woman, who was walking down the road toward his, the witness's, house. At the same time he saw a man, with his hat in his hand, running in the same direction. He could not say that these two parties were the deceased and the defendant. The deceased always went bareheaded and barefooted. The deceased, who was the witness's daughter-in-law, left her child at the witness's house that morning. The child was still there when the witness returned that evening, but the deceased had not been back. After nightfall, witness went to Ida Williams's house and inquired if the deceased had been there. Finding she had not, he left feeling uneasy, and early next morning commenced an unsuccessful search, which he kept up until four o'clock in the evening, when he met his son Monroe, the husband of the deceased, whom Mr. Doolen had told that his wife was missing. Discussing the route to take in a search, the witness and his son noticed a buzzard light on the ground about a hundred yards distant from the witness's house. They went to this spot and there found the body of the deceased woman, with a buzzard standing on her head, and another near the body. They had not yet molested it. The body was lying face downward, a red handkerchief was around the neck, the side of the head was mashed in, and one foot was resting on a patch of briars. They found a trail over which the body had been dragged, and followed it to the road where they found indications of a struggle, and a blending of barefooted tracks and those of a run down shoe, such as would be made by the shoes worn by the defendant. The body was not disturbed before the coroner's jury came.

Vina Reeves testified, for the State, that she lived on the edge of town about midway between the court house and Lewis Sallard's house. Between eleven and twelve o'clock on the Monday alleged in the indictment, the defendant came to the witness's house, but, declining to take a seat, stood in the door. He got a drink of water and went back to the door, and said: "I want to catch on sight;" that he was tired of being reported,

and wanted to kill about four niggers, when he would be willing to die; that when a man gets blood thirsty, it is time for him to die, and that if Ada (deceased) reported on him, he would kill her. Witness laughingly remarked: "You wouldn't kill her, would you?" He replied: "You ought to see how quick I would kill her; I would cut her head off as quick as I would a rabbit's." Witness had lived with the defendant three years, had often heard him talk of killing people, and thought little about such threats. Before leaving, the defendant said: "Before the sun goes down, there will be meat on board—to-morrow Ada will be in the bone-yard." The witness's daughter asked him what was the matter with his eye, and he replied that "h—ll was in his eye." About that time a colored woman went by the school house down the road. The defendant said: "There goes that d—d nigger now," and went off towards her in a run. Witness knew the woman to be Dicey White, and hallooed to defendant that that was not Ada, but he went on. Defendant returned presently and again stood in the door. About twelve o'clock, the deceased passed behind the school house, and the defendant broke off after her, with his hat in his hand, and soon struck a trot. Witness was sure of the time, as about that time she heard both the town clock and the round house whistle. Witness saw nothing more of defendant or deceased afterwards. While at her house the defendant dried his face with a red cotton handkerchief, which after deceased's death the witness saw around the neck of the deceased. Defendant also exhibited to witness a razor and a pistol, and said that when he had killed four niggers he would be ready to die, and would invite everybody to his hanging. He wore a dirty, dusty coat and undershirt, but no overshirt.

Lucinda Bonner, Annie Reeves and Lizzie Reeves, who were present at Vina Reeves's at the time testified to by Vina, corroborated, in substance, the testimony of that witness.

Justice of the Peace Walton testified, for the State, that on June 25, 1883, the deceased came to his office about nine o'clock, a. m., and made a complaint against the defendant. She appeared frightened and excited, and the witness told her to remain in his office until he could send his constable, Doolen, and arrest the defendant. The complaint charged the defendant with an assault and battery upon his wife, Ida Williams. The complaint was presented and admitted in evidence, over the objections of the defendant. On the next day after the complaint

was filed, the witness was informed of the murder of the deceased, and impaneled a coroner's jury to view the body. A red cotton handkerchief was drawn tightly around the neck of the deceased. It had made a deep indenture all round; the face was blackened and the tongue was hanging out. The side of the head had been crushéd in by a terrible blow, and the chest was much bruised and blackened. Turning the body over (it lay on the stomach), a large hole was found in the stomach, from which the entrails were protruding. The body lay in a small thicket twenty steps from the Corsicana and fair grounds road, and about one hundred yards from Lewis Sallard's house, and appeared to have been dragged to that point from the road. The deceased had no handkerchief about her neck the day before, when in witness's office, and was bareheaded and barefooted. This witness, as to the condition of the body, etc., at the time of the inquest, was corroborated by Henry Edwards and Z. T. Pardee.

Munroe Sallard corroborated his father as to the finding of the body, and testified in addition that he and the defendant had been working for Mr. Bob Harles. On Monday, when they started to work, defendant said that he would go into town and get some money from Mr. Harles. Witness went to work. On Tuesday morning, before day, witness woke up and found the defendant asleep. Defendant got up about daylight, and after breakfast, he and witness went to work. Defendant did not work right along with, but quite near to witness, and talked but little. When they were on their way to dinner, and near the house, they were told that Constable Doolen was at the house and wanted defendant and witnesss. Witness told defendant he had better step into the corn; which he did. Mr. Doolen afterwards told the witness that his, witness's, wife was missing, and that defendant was suspected of her murder. Witness saw no more of defendant until he saw him in court on this trial.

Constable Jesse Doolen testified, for the State, that on the last day the deceased was seen in town, he went to arrest the defendant, leaving the deceased in the justice's office. On his way back from an unsuccessful search he met Louis Sallard, coming out of Bernard's field, who told him that the defendant had just left him, going a certain way. Witness followed, but failed to find the defendant. Next day the deceased was reported missing, and witness rode out to Harles's, where he was told he would find defendant. He told Bob Harles and Munroe

Sallard that Ada was missing, and that defendant had been ac-. cused of her murder.   Failing to find the defendant in the field, witness went to Adeline Raspberry's house, without finding him.   He arrested the defendant next day.   Defendant did not then have on the clothes he wore at the trial, nor those he was described to have worn on the Monday of the homicide.   To the question, "What became of the clothes he had on when arrested?" the witness, over objection, was permitted to answer: "A colored man named Penn claimed them from defendant in jail, and defendant pulled them off and gave them to him." When witness told Harles that Ada was missing, and that defendant was suspected, no one was nearer than the cook in the kitchen.   He was careful to prevent general knowledge of his business.

——— Walker, sister to the deceased, testified, for the State, that she lived near the school house.   About eleven o'clock on the day of the disappearance of the deceased, she came by the witness's house with a white-bordered red handkerchief, in which she had some soap and flat red and white home-made candy tied.   She stopped, talked a short while, gave the witness some candy, and left, going behind the school house.

Adeline Raspberry testified, for the State, that on the fatal Monday, between four and five o'clock, the defendant, acting in no wise unusual, came to her house, and gave the children some flat red and white home-made candy.   He said that he had a fever, and asked to be allowed to lay down.   His clothes were very dirty.   He lay down on a lounge and slept until nine o'clock, when he got up and left.   Witness did not see him until next evening about four o'clock, just after constable Doolen left the house.   He then came to the house and asked if Mr. Doolen had been there.   Witness replied that he had just left.   He replied: "They accuse me of killing Ada, but I know nothing about her."   He did not then wear the same clothes he wore the day before.

Henry Penn testified, for the State, that on the night after the homicide the defendant came to his house and remained over night.   When the witness got up next morning the defendant was gone.   He found that his trunk had been broken into and a pair of pants, drawers and shirt had been taken. These articles the witness afterwards recovered from the defendant in jail.

The motion for a new trial presented the questions involved

in the rulings of this court, and assailed the charge of the court below.

*Hal. W. Greer*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE.    Harrison Williams was tried and convicted for the murder of Ada Sallard; the jury finding him guilty of murder of the first degree, with death as the penalty.

It appears that on the morning of the day of the homicide, Emeline Jordan and Ida Williams (wife of defendant) were on their way to Corsicana to report the defendant for beating his wife, Ida Williams, and that when they were near Louis Sallard's house, they saw Williams coming, and, as Emeline says, hunting her and Ida Williams; and that when defendant caught up with them he "beat them." The deceased, Ada Sallard, being present, witnessing the battery, told Williams that she was going to report him for it; whereupon Williams replied that "if you do I will knock your head off. I am tired of niggers reporting me, and I am going to kill the first nigger that does so." The deceased then left, going toward town; and at about 9 o'clock of that morning Ada Sallard did make complaint before the justice, in which she charged defendant with an assault and battery upon his wife, Ida Williams   And it also appears by the other facts, beyond all question, that defendant, in a most brutal and fiendish manner, took the life of this woman, and that the only instigation thereto was a fiendish revenge for thus "reporting him for the assault and battery upon his wife."

To this evidence of Emeline Jordan defendant objected, and saved bills.   Was this evidence competent?   We are of the opinion that it was.   It is insisted by the learned counsel for defendant that this evidence relating to the first assault upon his wife was calculated to prejudice the defendant.   This may be true, but because evidence shows another offense it does not always follow that it is not admissible.   This character of evidence, tending to show another offense, is frequently interwoven with facts which are clearly admissible, and should not be rejected because it developes some other offense.   In the case at bar it was of the greatest importance for the State to show malice.   This the State had a right to do, and in the clearest light, and in such manner that there could be no mistake in its origin and its influence upon defendant.

Before and at the time of the homicide, defendant wore a suit of clothes which were very much soiled—in the language of the witnesses, "very dirty." On Tuesday night, after the murder, defendant went to Henry Penn's, and while Penn was asleep broke open his trunk and took therefrom a pair of pants, a pair of drawers and·a shirt, and left before day, leaving his own soiled clothes at Penn's. Defendant was aware of the facts that he was suspected and that the officers were on the hunt for him.

Counsel for defendant objected to this evidence, and reserved his bill. Were these facts admissible? Under the circumstances of this case, we think they were clearly so. Here again another offense is shown. Whilst this is true, still these facts evidently prove that defendant was endeavoring to so disguise himself as to be able to elude his pursuers and make good his escape. This certainly was his purpose, or he never would have left his clothing at the very spot of the theft, thus furnishing indisputable evidence of his guilt.

We have examined all the grounds for reversal contained in the assignment of errors. In fact, we have very carefully examined this record, independent of the assignment of errors, and can find no cause why the judgment should be reversed. We have had some experience with murder trials, and can call to mind the evidence in quite a number of cases, but we must be permitted to say that none of these cases can furnish a parallel to the one disclosed in this record. This was a terrible crime, and committed in such a brutal and fiendish manner as to make humanity shudder.

This prosecution was ably conducted; the facts and circumstances being so marshalled that the guilt of the defendant is made to appear so clearly as to place it beyond all doubt. The judgment is affirmed.

*Affirmed.*